1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11   DAWN WENDY WHITTLE,                    Case No.:  20cv1452-NLS

12                          Plaintiff,      **ORDER:**

13   v.
                                            **(1) GRANTING IN PART AND**
14   ANDREW SAUL, Commissioner of           **DENYING IN PART PLAINTIFF'S**
     Social Security,                       **MOTION FOR SUMMARY**
15                                          **JUDGMENT; and**
                            Defendant.
16
                                            **(2) GRANTING IN PART AND**
17                                          **DENYING IN PART DEFENDANT'S**
                                            **MOTION FOR SUMMARY**
18                                          **JUDGMENT**

19
                                            **[ECF Nos. 23, 26]**
20

21

22        Dawn Whittle ("Plaintiff") brings this action under the Social Security Act, 42

23   U.S.C. § 405(g), and seeks judicial review of a final decision by the Commissioner of

24   Social Security ("Commissioner") denying her application for social security disability

25   and supplemental security income based on disability under Title XVI of the Social

26   Security Act ("the Act"), 42 U. S. C. §§ 1381 et seq.  ECF No. 9.  The parties filed cross-

27   motions for summary judgment.  ECF Nos. 23, 26.  Plaintiff filed a Reply.  ECF No. 27.

28   After considering the papers submitted, the administrative record, and the applicable law,

for the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion for summary judgment**, GRANTS IN PART AND DENIES IN PART** Defendant's motion for summary judgment, and **REMANDS** to the Commissioner for further proceedings consistent with this order.[1]

## I.   BACKGROUND

### A.   Procedural History

Plaintiff filed a Title II application for Social Security Disability Insurance on March 29, 2018.  Administrative Record ("AR") 192-95.  She alleged an inability to work since September 16, 2017, due to her disability.  *Id.*  The Commissioner initially denied Plaintiff's claim on September 14, 2018, AR 119-122, and on reconsideration on November 9, 2018.  AR 124-128.  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 8, 2019.  AR 40-86. Plaintiff testified at the hearing and she was represented by counsel.  *Id.*  An impartial vocational expert also testified at the hearing.  *Id*.  On October 28, 2019, the ALJ issued a decision denying Plaintiff's request for benefits, finding that Plaintiff was not disabled under the Social Security Act.  AR 16-34.  On June 23, 2020, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for the judicial review purposes.  AR 1-6.  Plaintiff timely commenced this action in federal court.

### B.   Personal History and Medical Treatment

#### 1.   Personal History and Self-Reported Symptoms

Plaintiff was born on July 28, 1962.  AR 192.  She was 57 years old at the time of her hearing before the ALJ.  AR 46.  She is married, and at the time of the hearing, her husband was in Colorado so she was living alone in a condo in San Diego.  AR 46-47. Her husband works as a truck driver.  AR 48.  She has two grown children.  AR 47.  She

---

[1] The parties have expressly consented that all proceedings in this case may be heard and finally adjudicated by the undersigned magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; ECF No.6.

has three small dogs at home.  AR 47.

Plaintiff is a high school graduate and completed two years of college.  AR 49. She does not have a college degree.  AR 49.  She worked as a medical assistant from 1990 to October 2017.  AR 49.  During this time, she worked mainly for San Diego Ortho Associates.  AR 50.  She also had a research position in 2017 and conducted other research from 2016-2017 as a self-employed contractor.  AR 50.  She testified that the last day she worked was September 16, 2017.  AR 51-55.  In her job as a medical assistant, Plaintiff specialized in worker's compensation work.  AR 72.  She also had a lot of surgical patients, including wound care, suture removals, staple removals, and cast removals.  AR 72.

In describing her tasks as a medical assistant, she stated that she did the following: removed stitches and provided wound care, cleaned exam rooms, answered calls, used the computer, assisted physicians and physicians assistants, copied medical records, wrote prescriptions and notes, stocked patient rooms with supplies, and assisted patients getting on the exam table and pushing them in wheelchairs.  AR 232.  She estimated that in a given day, she would walk, stand, and sit for 4 hours each, stoop for 1 hour, write/type/handle small objects for 7 hours, and reach for 5 hours.  AR 232.  The heaviest she lifted was 50lbs and she frequently lifted 10lbs.  AR 232.

Plaintiff has a driver's license and drives.  AR 49.  She testified that she drives about once a day in a range of about 5 miles.  AR 66.  She does the shopping in her household and usually goes to the store by herself.  AR 69.  She cannot lift heavy things like waters and will get someone to get it for her and have her husband help her unload. AR 70.  She and her husband share the chores.  She testified that she performs chores such as cleaning off countertops, making her bed, and watering her plants.  AR 70.  She does most of the cooking, but testified that after her disability, she spends all day doing it in stages to avoid standing for too long in the kitchen at a time.  AR 74.  She also helps feed her dogs, but testified that she does not carry them and their dog food is only a couple of pounds because they are small dogs.  AR 72.

Her daily activities vary depending on whether she is having a good or bad pain day. AR 67. On a good pain day, she testified that she would go shopping and visit with friends to chat, hang out, watch TV, and occasionally go out to eat. AR 67. These visits with friends usually last about two hours. AR 67. On a bad pain day, she will just be home on the couch or bed, and will not cook. AR 68. She testified that she cannot stay in bed or the couch for too long without pain so will move around. AR 68. She estimates having a couple days like that a week. AR 68. She also has some more severe bad days. AR 68. She estimates that in general, she needs to lie down a couple of hours in the morning and a couple of hours in the afternoon. AR 68. She testified that she could stand comfortably for only about 10 minutes. AR 74. The most comfortable position for her is laying down on her side with pillows between her knees. AR 75.

Plaintiff also has problems sleeping due to her pain. AR 69. She testified that she sleeps about three hours before she wakes up and takes pain medication before she goes back to sleep. AR 69. She will sleep about 8 hours a night, but it will be broken up. AR 69. She testified that she wakes up tired the next day. AR 69. Before her condition onset, she claims that she slept 8-9 hours every night. AR 69. She claims that she often needs to get up and stretch. For example, on a flight from Colorado back to San Diego, she got an aisle seat and as soon as she could get up and walk around, did so to stretch out her right leg. AR 65. She does not use a wheelchair, or a cane. AR 65-66. Plaintiff testified that her pain medication has side effects. AR 71. It makes her sleepy and she suffers from issues with concentration. AR 71.

### C. Medical Record

1. <u>Treatment at Kaiser Permanente</u>

Plaintiff was seen at Kaiser Permanente for over two years for her medical issues. AR 335-763. Plaintiff has a history of back pain, and had the following surgeries: cervical fusion in June 2004 and laminectomy and fusion of lumbar spine in January 2010. AR 367.

Plaintiff started seeing Dr. Pack on March 21, 2016. AR 341. She reported

chronic right hip, left hip, lower thoracic, bilateral lower lumbar, and bilateral lower extremity pain for years, and issues with her right knee occasionally giving away.  AR 341.  Plaintiff stated that the symptoms were aggravated by sneezing, bending, standing, and going up stairs.  AR 341.  She reported previously trying anti-inflammatory medication, epidural injection, narcotic mediation, oral steroids, and surgery on her cervical spine and lumbar spine.  AR 341.  She was noted to have pain in her low back, hip, and leg.  AR 341.  Dr. Pack ordered x-rays and MRIs.  AR 341.

On March 30, 2016, the x-ray results were reviewed.  AR 341.  The MRI results were communicated on May 27, 2016.  AR 341.

On August 24, 2016, Dr. Pack saw Plaintiff again for a follow-up.  AR 341.  Plaintiff reported more pain and instability in her right knee and more bilateral hip pain at night and bedtime.  AR 341.  She was prescribed a Prednisone taper and T#4 for sleep.  AR 341.

On September 28, 2016, Plaintiff saw Dr. Powell, reporting anterior right knee pain associated with taking the stairs.  AR 377-78.  On exam, her range of motion was 0-130, found to be stable, modern effusion, pain with compression through a range of motion, and nontender medial joint or later joint line.  AR 379.  The x-ray showed moderate medial narrowing and the MRI showed chondral thinning of the MFC and PF joint and a popliteal cyst.  AR 379.  Dr. Powell offered her an injection and physical therapy, but Plaintiff declined both options.  AR 379.

On January 30, 2017, Dr. Pack had another follow-up.  AR 361.  Plaintiff's usual pains were stable, but she reported having a new pain in the left posterolateral knee every morning when bending her knee getting out of bed and non-traumatic right shoulder pain with popping and painful range of motion.  AR 361.  On exam, she showed tenderness to palpation on her left knee, decreased flexion and abduction on her shoulder range of motion.  AR 361.  Internal and external rotation was normal but uncomfortable.  AR 362.  Dr. Pack ordered more MRIs.  AR 362.

On July 14, 2017, Dr. Pack met with Plaintiff and reviewed her MRI results.  AR

341.  At that appointment, Plaintiff complained about more right knee pain, in addition to the bilateral hip and back pain.   AR 345.  She was again prescribed a Prednisone taper and T#4 for sleep.  AR 346.

On September 15, 2017, Plaintiff had another follow-up, where she complained that her multiple joint pain was worsening and she felt like she could not work anymore. AR 343.

On December 15, 2017, Plaintiff was seen by Dr. Pack again.  AR 341.  She complained that her pain continued to get worse.  AR 341.  Upon examination, no significant changes were observed compared to the last exam.  AR 341.

On April 28, 2018, Plaintiff was seen by Dr. Jiu for back pain.  AR 329.  She claimed that it was sudden onset, unlike anything she had experienced before, despite having several back surgeries.  AR 329.  The pain was in her middle and low back area. AR 329.  Movement was impossible and she was not able to get relief with Tylenol with codeine.  AR 329.  During the physical exam, she presented as well-developed, well-nourished, and in no distress.  AR 330.  She was fine at rest, but reported pain with any movement and exhibited decreased range of motion.  AR 330.  On findings, Dr. Jiu noted a stable post anterior fusion L5/S1 with disc spacer, but slight narrowing of the L4/L5 disc space and a gentle curvature of the lower thoracic spine convex to the left which is not significantly changed.  AR 331.

On June 25, 2018, Plaintiff had a follow-up appointment with Dr. Pack.  AR 482. Her back pain was back to baseline after the flareback in April.  AR 482.  An updated x-ray showed slight worsening of Plaintiff's L4-5 spondylolisthesis.  AR 482.  On physical exam, she presented with tenderness to palpation in L4-5 but showed an active lumbar range of motion in normal range for flexion with some discomfort, and decreased extension with discomfort.  AR 482.

On January 23, 2019, Plaintiff had another follow-up with Dr. Pack.  AR 644. This visit followed Plaintiff's gastric bypass surgery in the prior month, after which she lost 30 pounds.  AR 645.  She reported experiencing significant spinal pain waking up

from surgery and the pain has been aggravated by exercise. AR 645. She was prescribed codeine for pain management. AR 647.

On May 29, 2019, Plaintiff saw Dr. Pack again. AR 726. Plaintiff continued to report lower back pain. AR 727. Dr. Pack prescribed her more pain medication and referred her for possible spine surgery. AR 729. An MRI of her lumbar spine showed mild disc desiccation at T12-L1 and at L3-L4, mild disc desiccation with a circumferential disc bulge, moderate bilateral facet hypertrophy with left-sided facet joint effusion, and mild dural compression. AR 740.

The record included notes from Dr. Flippin for the spine surgery consult on August 27, 2019. AR 765. He noted that surgical treatment would be elective, difficult to predict efficacy, and he would only recommend if there were no lasting benefit from non-surgical options. AR 765.

### 2.   S&L Medical Group

Dr. Yashruti from the S&L Medical Group performed a complete orthopaedic evaluation on Plaintiff on August 30, 2018. AR 466. Plaintiff complained about neck, right shoulder, bilateral wrist, upper and lower back, right knee, and left foot pain. AR 466. Plaintiff explained that her pains have developed gradually over time and are aggravated by prolonged sitting, standing, walking, bending, and lifting. AR 466.

On exam, Plaintiff ambulated without difficulty and without a limp or use of a cane. AR 468. She was able to squat partially and recover to standing without help or support. AR 468. Her cervical spine showed range of motion with forward flexion of 40/50 degrees, extension of 30/60 degrees, left side bending of 15/45 degrees, right side bending of 15/45 degrees, left rotation of 30/80 degrees, and right rotation of 30/80 degrees. AR 468. Her shoulders showed no decrease in range of motion except for forward flexion on 150 right/150 left/180 degrees. AR 468. Her lumbosacral spine showed range of motion with forward flexion 70/90 degrees, extension 0/25 degrees, left side bending 5/25 degrees, and right side bending 5/25 degrees. AR 469. All other physical tests were normal. AR 468-470. Her neurological examination showed

decrease sensation over the lateral aspect of the right lower leg below the knee, no weakness in muscles, straight leg raise at 60 degrees on the right with right calf pain. AR 470. X-ray of the right knee taken revealed minimal degenerative changes and narrowing of the medial and lateral compartment. AR 471.

Based on the exam, the report from Dr. Yashruti concluded that Plaintiff is able to sit for six hours a day, stand and walk on level ground six hours a day, squat, kneel, crouch, and crawl occasionally, lift 20 pounds occasionally and 10 pounds frequently, and able to reach with the arms and manipulate with hands frequently. AR 471.

3.   <u>San Diego Orthopaedic Associates</u>

Plaintiff's medical records includes several letters from this group, which appears to have reviewed a worker's compensation claim on her behalf. AR 310-320. On June 29, 2017, Plaintiff was described as having tenderness in paracervical region of her spine and exhibiting pain with extremes of neck motion in her spine. AR 313. The examination was normal as to upper extremities with full motion without pain. AR 313. Upon review of the cervical spine, Plaintiff was observed to have a C5-C6 fusion, a psuedoarthroses at C6-C7, and moderate segmental breakdown at C4-C5. AR 314. She was prescribed Tylenol with codeine and ibuprofen, ice/gel packs, and exercise with a home cervical traction device. AR 313. A similar diagnosis was made on March 16, 2018. AR 311-12.

She was seen again on June 22, 2018. AR 492. The examination showed that she was tender in the paracervical area. AR 492. She was guarded in her neck motion and complained of moderate pain at the extremes of motion. AR 492. Motor and sensory examinations were normal. AR 492. The examination was normal as to upper extremities with full motion without pain. AR 492.

She had another visit on September 26, 2018. AR 495. Extension and rotation of the head and neck produced pain in Plaintiff's right shoulder. AR 495. The remainder of the exam was similar to her exam in June 2018. AR 495-96. A physician also reviewed more views of her cervical spine, which showed probable delayed union or

pseudoarthrosis at one of the segments of the cervical area.  AR 496.

She had a final visit on January 22, 2019.  AR 498.  This visit against showed similar results to the previous visits.  AR 498-500.

### 4.   Mental Health Records

On June 21, 2016, she was seen by Dr. Howard Williams to get a refill of her Xanax prescription.  AR 308.  He diagnosed her with anxiety, and noted that she was undergoing specific stressors in her life at that time.  AR 308.

During her visits overall, she presented as alert, with normal mood and affect and oriented to person, place, and time.  AR 330; 336; 364; 368; 374; 375; 457;   In an appointment on November 18, 2016, Plaintiff was noted to be negative for depression and not nervous/anxious.  AR 368.

### 5.   Dr. Mazuryk

Dr. Mazuryk is a state agency medical consultant who provided a consultative examination at the initial level.  AR 87-102.  He determined that Plaintiff suffered from three severe medically determinable impairments: Osteoarthrosis and Allied Disorders; Disorders of Back-Discogenic and Degenerative; and Obesity.  AR 96.  For the psychiatric review, he found that Plaintiff suffered from Anxiety and Obsessive-Compulsive Disorders but that she had no limitations in (1) understanding, remembering, or applying information, (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing herself.  AR 96.  He noted that she has a history of anxiety disorder, but there was "no abnormality of mental status."  AR 96.

In evaluating Plaintiff's statements regarding the intensity, persistence, and functional limitations, Dr. Mazuryk concluded that they were not substantiated by the medical evidence alone and that they were partially consistent.  AR 97-98.  As such, he evaluated her RFC as follows:

> Occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk with normal breaks for 6 hours in a 8 hour work day; sit with normal breaks for 6 hours in a 8 hour work day; unlimited for push and/or pull; occasionally climbing ramps/stairs; occasionally climbing

ladders/ropes/scaffolds; occasionally balancing; occasionally stooping; occasionally kneeling; occasionally crouching; occasionally crawling; limited reaching left and right overhead; no handling, fingering, feeling, or communicative limitations; environmental limitations as to extreme cold and vibration.

AR 98-100.  Dr. Mazuryk concluded that Plaintiff could perform her previous work as a medical assistant, as generally performed in the national economy.  AR 101.

6.  <u>Dr. Vu</u>

Dr. Vu is a state agency medical consultant who provided a consultative examination at the reconsideration level.  AR 104-116.  Dr. Vu confirmed the same severe impairments as on initial review and the same lack of psychiatric impairments.  AR 110.  Dr. Vu also evaluated her RFC identical to on initial review.  AR 112-14.

**D.  Husband's Functional Report**

Plaintiff's husband, Joseph Whittle, also submitted a third-party functional report on her behalf.  AR 262-69.  He wrote that Plaintiff's conditions "completely" limit her ability to work.  AR 262.  For daily activities, he stated that Plaintiff makes lunch, does light housework, watches TV, does puzzles, fixes dinner, and rests.  AR 263.  Plaintiff also feeds and washes the dogs.  AR 263.  He stated that she cannot sleep through the night normally and wakes up moaning.  AR 263.  For meals, he stated that Plaintiff prepares her own meals, including sandwiches and easy meals, daily and it takes her about 10-20 minutes.  AR 264.  For housework, she does light cleaning and laundry, and also for only 10-20 minutes at a time because she cannot stand or bend for longer than that.  AR 264.  He stated that she goes outside daily, and walks, drives a car, and rides in a car.  AR 265.  He stated that she shops in stores for groceries and gifts, once a week for about 45 minutes.  AR 265.  She also pays bills, counts change, handles a savings account, and uses checkbooks.  AR 265.  She watches TV, reads, does puzzles, and talks with her children and grandchildren daily.  AR 266.  He stated that she is limited in lifting, squatting, bending, standing, walking, sitting, kneeling, climbing, concentration and competing tasks.  AR 267.

### E.   Vocational Expert's Testimony

Vocational Expert ("VE") Alan Cummings testified at the hearing.  AR 76.  VE Cummings first characterized Plaintiff's past employment as Medical Assistant, DOT code 079.362-010, with work actually performed at the heavy exertional level.  AR 76. The ALJ posed the following hypothetical with these limitations:

- "claimant's same age, education and work experience"
- "at some point she was capable of lifting and carrying 20 pounds occasionally and ten pounds frequently, she could sit six hours and stand and/or walk six hours in an eight-hour day with industry standard breaks, and here I'm assuming I am using ten to 15 minute breaks in the a.m. and the afternoon and 30 minutes for lunch"
- "unlimited in pushing or pulling other than is already restricted for the lifting and carrying limitations. However, she can only occasionally do overhead reaching, or overhead work and she can do no extreme neck flection or extension work"
- "can occasionally perform all postural activities and she must avoid concentrated exposure to extreme cold and vibrations"

AR 76-77.  When asked if she could perform her past work with that hypothetical, the VE answer "[y]es, as is generally performed, not as actually performed."  AR 77.

The ALJ then modified the hypothetical to add "reaching with the upper extremities at shoulder level would be frequent."  AR 77-78.  The VE confirmed that this would be consistent with occasional overhead work and that she could perform her past work as generally performed per DOT, not as actually performed.  AR 78.  The VE stated that the DOT only requires frequent handling, and frequent fingering.  AR 78.  The ALJ asked if the answer would be the same if he added "frequent handling and fingering as well as the frequent reaching at the shoulder level" and the VE confirmed she could perform the past job as generally performed.  AR 78.

The ALJ asked a third hypothetical, where he added the additional restriction that

1    "she would also need a sit/stand option and let's say that that would be every 30 minutes

2    for at least a five-minute position change from either standing and walking to sitting, or

3    sitting to standing or walking while on task."  AR 79.  The VE testified that this would

4    preclude past work.  AR 79.

5          The ALJ also questioned the VE regarding the DOT requirements for Plaintiff's

6    past work.  AR 79.  The VE confirmed that the DOT does not cover industry standard

7    breaks, extreme neck flexion or extension, a sit/stand option, and occasional overhead

8    reach (i.e., directional reaching).  AR 79-80.  The VE confirmed and stated that he "relied

9    on my experience, education and training to offer opinions regarding those issues."  AR

10   80.  He also confirmed that with regard to his opinions applying to work generally

11   performed and not actually performed, he relied on the record.  AR 80.

12         Plaintiff's counsel also asked some follow up questions.  First, he asked that if all

13   around reaching is limited to occasional, whether past work would be precluded, and the

14   VE confirmed that it would.  AR 80.  Second, he asked what percentage of time an

15   individual would be permitted to be off task in the workplace.  AR 81.  The VE answered

16   that it would be up to 10%.  AR 81.  Third, he asked if laying down at work would be

17   precluded outside of the normal work breaks, and the VE stated that it would be

18   precluded.  AR 81.  Finally, he asked what the customary tolerance for absenteeism was

19   and the VE testified that up to one month would be tolerated.  AR 82.

20   **II.    THE ALJ DECISION**

21         **A.    The Sequential Process**

22         To qualify for disability benefits under the Social Security Act, an applicant must

23   show that he or she cannot engage in any substantial gainful activity because of a

24   medically determinable physical or mental impairment that has lasted or can be expected

25   to last at least twelve months.  42 U.S.C. §§ 423(d), 1382(c)(a)(3).  The Social Security

26   regulations establish a five-step sequential evaluation to determine whether an applicant

27   is disabled under this standard.  20 C.F.R. §§ 404.1520(a), 416.920(a); *Batson v. Comm'r*

28   *of the Social Security Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004).

At step one, the ALJ determines whether the applicant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(b).  If not, then at step two the ALJ must determine whether the applicant suffers from a severe impairment or a combination of impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(c).  If the impairment is severe, at step three the ALJ must determine whether the applicant's impairment or combination of impairments meets or equals an impairment contained under 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* §§ 404.1520(a)(4)(iii), 416.920(d).  If the applicant's impairment meets or equals a listing, he or she must be found disabled.  *Id.*

If the impairment does not meet or equal a listing, the ALJ must determine the applicant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(e).  Then, the ALJ must determine at step four whether the applicant retains the residual functional capacity to perform past relevant work.  *Id.* §§ 404.1520(a)(4)(iv), 416.920(f).  If the applicant cannot perform past relevant work, at step five the ALJ must consider whether the applicant can perform any other work that exists in the national economy.  *Id.* §§ 404.1520(a)(4)(v), 416.920(g).

The applicant carries the burden to prove eligibility from steps one through four but the burden at step five is on the agency.  *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).  Applicants not disqualified at step five are eligible for disability benefits.  *Id.*

### B.   Substance of the ALJ's Decision

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 16, 2017, the alleged onset date.  AR 21.  At step two, the ALJ determined Plaintiff's suffers from several severe impairments:  cervical degenerative disc disease (status post C5-C7 fusion), lumbar degenerative disc disease (status post L5-S1 fusion), hip bursitis, right knee meniscus tear, and obesity.  AR 21.   At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  AR 21-24.  Next, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b).  *Id.*

"[Claimant] can perform occasional lifting and/or carrying of 20 pounds, and frequent lifting and/or carrying of 10 pounds; in an eight-hour workday with industry standard breaks of 10-15 minutes in the morning and afternoon and 30 minutes for lunch she can stand and/or walk for six hours and sit for six hours; she is unlimited in pushing and pulling other than as already shown for lifting and carrying; she can perform occasional overhead reaching / overhead work, with no extreme neck flexion or extension; she can frequently handle and finger with the bilateral upper extremities; she can occasionally perform all postural activities; and she must avoid concentrated exposure to extreme cold or vibrations.

AR 24.

At step four, the ALJ determined that Plaintiff is capable of performing her past relevant work as a Medical Assistant, DOT #079.362-010, light, SVP 7, as generally performed. AR 29. As such, the ALJ did not need to go to step five, and concluded Plaintiff is not disabled as defined in the Social Security Act. AR 29-30.

## III. LEGAL STANDARD OF REVIEW

The Social Security Act provides for judicial review of a final agency decision denying a claim for disability benefits. 42 U.S.C. § 405(g). A reviewing court will set aside a denial of benefits only when the ALJ decision is "based on legal error or not supported by substantial evidence in the record." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (*quoting Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *see Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (quotation and citation omitted). It is a "highly deferential" standard of review. *Valentine v. Astrue*, 574 F.3d 685, 690 (9th Cir. 2009). However, the Court must consider the entire record, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and it "may not affirm simply by isolating a specific quantum of supporting evidence." *Garrison v. Colvin*, 759 F3d. 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th

Cir. 2007)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Vasquez v. Astrue*, 547 F.3d 1101, 1104 (9th Cir. 2008) (internal quotations and citation omitted). If the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld. *Molina*, 674 F.3d at 1111. It is not the Court's role to reinterpret or re-evaluate the evidence, even if a re-evaluation may reasonably result in a favorable outcome for the plaintiff. *Batson*, 359 F.3d at 1193. Moreover, the Court may not uphold an ALJ's decision on a ground not actually relied on by the ALJ. *Molina*, 674 F.3d at 1121.

## IV. DISCUSSION

Plaintiff contends the ALJ erred in four ways: (1) by failing to explain the discrepancy between the VE's testimony and the Dictionary of Occupational Titles ("DOT"); (2) by failing to provide a mental residual functional capacity finding; (3) by discrediting Plaintiff's testimony as to her pain, physical, and mental limitations; and (4) by discrediting treating physician Dr. Pack. ECF No. 23-1 at 12. The Court will address each these arguments in turn.

### A. The VE Testimony and The DOT Definition

Plaintiff first argues that the ALJ erred in failing to address the discrepancy between the testimony of the VE and the DOT as to directional reaching. ECF No. 23-1.

During the VE's testimony, he identified Plaintiff's prior work as Medical Assistance, DOT Code 079.362-010, which is classified as light, skilled, SVP 7. AR 76. He also stated that "Records suggest work was actually performed at the heavy exertional level." AR 76. The VE testified that Plaintiff could perform her previous job as generally performed, but not as actually performed. AR 77-78.

The ALJ then addressed the testimony and its consistency with the DOT as follows:

> **Q:** Okay, so we're not going to use that then since it has to be more than one job, and let's see here – your testimony's consistency with the DOT.

The DOT does not cover industry standard breaks --

**A:** Right.

**Q:** Does not cover extreme neck flection or extension, and it does not cover a sit/stand option, right?

**A:** That's correct. All those issues are –

**Q:** Anything else?

**A:** Not that I recall, let's see. Occasional overhead reach

**Q:** Oh, right. Yeah, directional reaching right?

**A:** Right. So, all those issues are not addressed by the DOT. I relied on my experience, education and training to offer opinions regarding those issues. Also, how the work was actually performed was not consistent with the DOT. I relied on the record. Otherwise, my testimony has been consistent with DOT.

AR 79-80.

Plaintiff argues the DOT is not silent on the issue of directional reaching.  First, Plaintiff points to the DOT's definition of Medical Assistant as requiring "frequent" reaching.  ECF No. 23-1 at 17 (citing https://occupationalinfo.org/08/079352010.html).  Second, Plaintiff cites to the DOT defining "reaching" as "extending the hands and arms in any direction."  *Id.* (citing https://www.ssa.gov/OP_Home/rulings/di/02/SSR85-15-di-02.html).  Plaintiff points to the testimony of Dr. Yashruti, who found that Plaintiff was not able to extend or rotate to the full range of what a normal person would be able to do.  AR 469.  Further, Plaintiff argues that based on the common experience with the job of Medical Assistant, one in this position would be required to engage in many tasks that would require that person to engage in all around reaching, in particular frequent reaching in all directions.  ECF No. 23-1 at 18-20.

Defendant does not dispute that the Medical Assistant position requires frequent reaching under the DOT and that reaching is further defined as reaching in any direction.  ECF No. 26 at 6.  Defendant argues however that Plaintiff was only limited in the RFC

for overhead reaching and that the DOT was not specific as to the requirements for overhead reaching specially.  Thus, Defendant argues that there is no direct conflict between the DOT and the VE's testimony, and the ALJ did not err on relying on the VE's testimony based on his experience, education, and training.  *Id.* at 6-7.

Where the VE's opinion and testimony "conflicts with, or seems to conflict with, the requirements listed in the Dictionary, then the ALJ must ask the expert to reconcile the conflict before relying on the expert to decide if the claimant is disabled."  *Gutierrez v. Colvin*, 844 F.3d 804, 807 (9th Cir. 2016).  "For a difference between an expert's testimony and the Dictionary's listings to be fairly characterized as a conflict, it must be obvious or apparent."  *Id.*  The Ninth Circuit has further expounded that "[t]his means that the testimony must be at odds with the Dictionary's listing of job requirements that are essential, integral, or expected."  *Id.*  "[T]asks that aren't essential, integral, or expected parts of a job are less likely to qualify as apparent conflicts that the ALJ must ask about."  *Id.*

To illustrate an application of this, in *Gutierrez*, the past job was that of a cashier. *Id.*  Plaintiff in that case could not lift more than five pounds with her right arm or lift that arm above her shoulder.  *Id.* at 807.  Cashier, as defined in the DOT, requires frequent reaching and the court acknowledged that "reaching" "connotes the ability to extend one's hands and arms 'in any direction.'"  *Id.* at 808.  However, the court held that "not every job that involves reaching requires the ability to lift overhead" and that cashier was an example of such a job.  *Id.*  ("Given how uncommon it is for most cashiers to have to reach overhead, we conclude that there was no apparent or obvious conflict between the expert's testimony and the Dictionary.").  In contrast, in the case cited by Plaintiff, *Lamear v. Berryhill*, 865 F.3d 1201, 1205 (9th Cir. 2017), the issue was whether "it [was] likely and foreseeable that an office helper, mail clerk, or parking lot cashier with limitations on his ability to 'handle, finger and feel with the left hand' could perform his duties."  There, the court found that the DOT's description for these jobs made it likely and foreseeable that a person would need to use *both* hands to perform the essential,

integral, or expected tasks in an acceptable manner.  *Id.*  The court remanded the case to have the ALJ question the VE to reconcile these jobs and that plaintiff's limitations on his left hand.  *Id.*

Here, the Court finds that the situation is more like in *Gutierrez* rather than *Lamear*.  Like in *Gutierrez*, whether there is an actual conflict between the DOT and VE is not as simple as Plaintiff contends—rather, the Court must consider whether the job of Medical Assistant requires performance of essential, integral, or expected tasks where frequent overhead reaching is necessary.  The DOT lists the duties of a Medical Assistant as follows:

> Interviews patients, measures vital signs, such as pulse rate, temperature, blood pressure, weight, and height, and records information on patients' charts. Prepares treatment rooms for examination of patients. Drapes patients with covering and positions instruments and equipment. Hands instruments and materials to doctor as directed. Cleans and sterilizes instruments. Inventories and orders medical supplies and materials. Operates x ray, electrocardiograph (EKG), and other equipment to administer routine diagnostic test or calls medical facility or department to schedule patients for tests. Gives injections or treatments, and performs routine laboratory tests. Schedules appointments, receives money for bills, keeps x ray and other medical records, performs secretarial tasks, and completes insurance forms. May key data into computer to maintain office and patient records. May keep billing records, enter financial transactions into bookkeeping ledgers, and compute and mail monthly statements to patients.

*See* https://occupationalinfo.org/07/079362010.html.

Here, Plaintiff's RFC was limited to occasional overhead reaching.  AR 76-77. The Court agrees that the tasks required of a Medical Assistant likely requires some overhead reaching (for example, in tasks such as draping patients, positioning equipment), but the Court cannot conclude that overhead reaching would be required on more than an occasional basis.  The Medical Assistant position includes many duties where such reaching would not be required, and as the DOT recognizes, "frequent" means that "these types of activities could be necessary for as much as two-thirds of the workday."  *Lamear*, 865 F.3d at 1206.  The DOT is not explicit on what level of reaching

is required in a specific direction, and *Gutierrez* squarely rejected Plaintiff's view that just because the DOT defines reaching as in "any direction," a worker must be able to perform frequent reaching in *all* directions. *Gutierrez*, 844 F.3d at 807 ("not every job that involves reaching requires the ability to lift overhead").

Therefore, the Court concludes that there was no "conflict" between the VE's testimony and the DOT such that the ALJ needed to resolve the conflict. The Court finds no error on this ground.

### B.    Mental Residual Functional Capacity

Plaintiff next argues that the ALJ erred by failing to include any mental limitations when defining the RFC. In Social Security cases, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (citing *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)). This duty exists even when the claimant is represented by counsel, as Plaintiff was here, though it is heightened when a plaintiff is not. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). This duty is triggered by "ambiguous evidence" or when the ALJ finds that "the record is inadequate to allow for proper evaluation of the evidence." *Id.*

Here, Plaintiff argues that it is not disputed that Plaintiff had been diagnosed with anxiety, but the ALJ failed to obtain the records from Dr. Howard Williams, who treated Plaintiff for anxiety, and did not order a mental consultation. ECF No. 23-1 at 22. Faced with this record, Plaintiff argues that the ALJ then improperly faulted Plaintiff for not having received treatment for anxiety and used this against her to find no mental limitations. *Id.* at 22-23.

Defendant counters that the ALJ did sufficiently consider the mental limitations and simply found there was none to be included in the RFC. ECF No. 26 at 7. Defendant argues that the burden to establish entitlement to benefits rests on Plaintiff and Plaintiff did not meet this burden. *Id.* at 10-11. Plaintiff was represented by counsel, and when the ALJ inquired whether the record was complete at the hearing, counsel stated yes. *Id.*

at 11.  In addition, Defendant argues that Plaintiff herself stated that she did not need a psychiatric consultative examination.  *Id.* (citing AR 92).  Thus, based on this record, Defendant argues that the ALJ did not err.  First, throughout the record, Plaintiff always presented as fully oriented, with normal affect and mood, and exhibited no signs of mental limitations in her encounters with health care providers.  *See, e.g.*, AR 330, 369, 376, 576.  Second, Defendant argues that it is proper to consider the lack of treatment of anxiety in finding no mental limitations.  ECF No. 26 at 7-8.  Third, Defendant argues that Plaintiff's daily activities—which included driving, shopping in stores, performing household tasks, and traveling—did not suggest significant impact based on Plaintiff's anxiety either.  *Id.* at 8.  Finally, while agreeing with Plaintiff that the state consultant examiners did diagnose Plaintiff with anxiety, neither of them found several impairment. *Id.* at 8-9.

After considering the law and both parties' arguments, the Court agrees with Defendant.  The relevant portion of the ALJ's discussion is as follows:

> The claimant's medically determinable mental impairment of anxiety disorder does not cause more than minimal limitation in her ability to perform basic mental work activities and is therefore nonsevere. She alleges difficulty with handling stress, handling change in routine, and concentration (Ex. 4E, Testimony).

> Treatment notes from June 2016 indicate that she was prescribed medication for anxiety (Ex. 1F at 7). Otherwise she has sought little treatment for a mental impairment. Notably, in September 2018, during a routine eye examination, her mood and affect were normal and she was fully oriented (Ex. 12F at 73).

> The summary of the objective medical evidence supports the following findings. The first functional area is understanding, remembering, or applying information. In this area, the claimant has no limitation. The next functional area is interacting with others. In this area, the claimant has no limitation. The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has no limitation. The fourth functional area is adapting or managing oneself. In this area, the claimant has no limitation. Overall, she has sought little treatment for a mental impairment during the relevant period. She was cooperative with the

consultative examiner, she is cooperative with treating medical providers, and her hearing demeanor was appropriate. In addition, her reported daily activities suggest a higher level of functioning than alleged. For example, she can drive, she can shop in stores, she can do household chores, she can do laundry, she cares for her small dogs, and, during the relevant period, she has traveled back and forth between a residence in Colorado and a residence in California (Ex. 4E, Testimony). The objective medical evidence does not support mental or social limitations.

AR 22.

The Court finds that the ALJ sufficiently developed the record. The ALJ found the record clear as to the effect of Plaintiff's mental limitations. The only mention in the record is a visit on June 21, 2016, with Dr. Williams to get a refill of Xanax. AR 308. In the visit notes, Dr. Williams states that he has not seen Plaintiff since December 2014, and that she was now with Kaiser Permanente. AR 308. The record has extensive notes from her treatment at Kaiser Permanente. AR 321-446, 448-461, 504-763. In these records, there was little mention of treatment for anxiety. *See* AR 368 (noting that Plaintiff did not suffer from depression and was not nervous/anxious). In these visits, Plaintiff also always presented as alert, with normal mood and affect. AR 330, 336, 368, 374, 375, 457. Based on this record, the ALJ could reasonably have concluded that there was no further need to develop the record.

Further, based on this record, the ALJ reasonably concluded that Plaintiff did not suffer from any mental limitations that needed to be included in the RFC. The ALJ did note that there was a lack of treatment in the record, but this was not the only evidence relied upon. The ALJ noted that Plaintiff presented at examinations fully oriented with normal mood and affect. AR 22. The ALJ noted that she was cooperative with medical providers and the state consultants. AR 22. The ALJ also cited to Plaintiff's testimony as to her own reported activities, which included shopping, chores, laundry, caring for her dogs, and traveling between a residence in California and a residence in Colorado. AR 22. Finally. the ALJ relied on the state examiner's conclusion. Both Dr. Mazuryk and Dr. Vu noted that Plaintiff had an anxiety diagnosis, but that she suffered from no

abnormality of mental status and suffered from no limitations in (1) understanding, remembering, or applying information, (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing herself.  AR 96; 110.

Thus, in summary, the Court finds that the ALJ did not err in finding Plaintiff suffered from no mental limitations and therefore, not including any in the RFC.

### C.    Plaintiff's Pain, Physical, and Mental Limitation Testimony

Plaintiff next argues that the ALJ did not provide sufficient reasons to reject her subjective testimony as to the limiting effects of her impairments.  ECF No. 23-1 at 23-26.

The ALJ must engage in a two-step analysis in determining how much to credit the claimant's symptom testimony.  First, the claimant must show that the impairment can be expected to cause some degree of pain, or other symptoms alleged, and second, if there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering clear and convincing reasons for doing so. *Trevizo*, 871 F.3d at 678 (citing *Garrison,* 759 F.3d at 1014-15).  "The clear and convincing standard is the most demanding required in Social Security cases."  *Garrison*, 759 F.3d at 1015.  "An ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination."  *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015).  The ALJ is required to "specify which testimony [he] finds not credible, and then provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination."  *Id.*  A "line-by-line exegesis of the claimant's testimony" is not required, but the ALJ must do more than offer "non-specific conclusions that [the claimant's] testimony was inconsistent with her medical treatment." *Lambert v. Saul*, 980 F.3d 1266, 1268, 1277 (9th Cir. 2020).

Here, the ALJ opined as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be

> expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because the objective medical evidence indicates that her symptoms improved and stabilized with treatment. She has full strength in her extremities and she does not require an assistive device to walk. In addition, her reported daily activities suggest a higher level of functioning than alleged.

AR 27-28.

Plaintiff argues that the ALJ's conclusion is not supported by the record. First, Plaintiff points to her treating notes with Dr. Pack, which she alleges shows that her symptoms did not improve with surgeries, medications, and workplace modifications. ECF No. 23-1 at 25. Second, Plaintiff argues that Dr. Yashruti's opinion showed that she experienced various limitations in cervical and lumbarsacral spine rotations, extensions, and bending. *Id.* at 25-26.

Defendant's opposition on this issue focuses not on the ALJ's opinion and reasons given, but more on why the ALJ's RFC is supported by the record. ECF No. 26 at 11-14. Defendant argues that the ALJ properly weighed the medical evidence, that the ALJ properly relied on Plaintiff's description of her daily activities, and Plaintiff's general medical history, that showed that she managed her symptoms with conservative treatment and declined to have further surgery for her back issues. *Id.*

Neither party directly addresses the requirement to meet the "clear and convincing" evidence standard in their briefing, both instead focusing on whether the ALJ's dismissal of Plaintiff's subjective testimony was in fact supported or unsupported in the record. This is the issue that the Court finds with the ALJ's opinion. The ALJ is required to specify which testimony [he] finds not credible, and then provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination." *Brown-Hunter*, 806 F.3d at 489. Here, the ALJ does not identify the part of Plaintiff's

testimony that was not credible outside of generally referencing her "statements about the intensity, persistence, and limiting effects of her symptoms."  Further, the reasons given are general and not tied to specific testimony that Plaintiff gave.  For example, the ALJ points out that Plaintiff "has full strength in her extremities and she does not require an assistive device to walk" but does not explain what testimony Plaintiff gives that this contradicts, undermining her credibility.

Thus, the Court finds that the ALJ's statement about Plaintiff's subjective testimony being inconsistent with the evidence of record falls short of the "clear and convincing" standard.

### D.  Treatment of Dr. Pack's Evaluation

Finally, Plaintiff argues that the ALJ failed to provide sufficient reasoning for its treatment of her treating physician Dr. Pack's evaluation.  ECF No. 23-1 at 26-27.

### 1.  The Applicable Legal Standard

On January 18, 2017, the SSA revised the regulations that apply to evaluation of medical evidence, effectively abolishing the "treating physician rule" for cases filed on or after March 27, 2017.  This changed regulation applies to Plaintiff's case, as it was filed on March 28, 2018.  This means that an ALJ no longer must assign a certain weight to a medical practitioner's opinion.  Rather, ALJs are now to "consider" the "persuasiveness" of opinions from all medical sources.  20 C.F.R. § 1520c(a).

Under the new regulations, the ALJ must consider the medical source opinion's supportability, its consistency, the relationship between the source and the claimant, the source's specialization, and other factors such as the source's knowledge of other evidence, social security requirements, and whether there was subsequently submitted evidence.  *Id.*; 20 C.F.R. § 404.1520c(c)(1)–(c)(5).  Though an ALJ may discuss each of the factors to be considered in his opinion, the regulations only require the ALJ to explain how he considered the most important factors—supportability and consistency—when determining a medical source's persuasiveness, unless two conflicting medical sources are both equally well-supported and consistent with the record.  20 C.F.R. §

1    404.1520c(b)(2)–(3).

2          Departing from prior case law, under the new regulations, an ALJ is not required to

3    "defer or give any specific evidentiary weight, including controlling weight, to any

4    medical opinion(s) or prior administrative finding(s), including those from [a claimant's]

5    medical sources."  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  The new regulations

6    override the treating physician rule, which automatically gave greater weight to the

7    medical opinions of treating physicians, required clear and convincing reasons for

8    rejecting an uncontradicted medical opinion of a treating physician, and required specific

9    and legitimate reasons supported by substantial evidence in the record for rejecting the

10   contradicted medical opinion of a treating physician.  *Jones v. Saul*, No. 2:19-cv-01273-

11   AC, 2021 WL 620475, at *6-*10 (E.D. Cal. Feb. 17, 2021) (concluding that "the new

12   regulations regarding the evaluation of medical opinion evidence displace the Ninth

13   Circuit's prior precedents implementing the [Treating Physician Rule]").

14         The Ninth Circuit has not yet addressed whether, and to what extent, ALJs are still

15   held to the "clear and convincing" and "specific and legitimate" standards when rejecting

16   a medical opinion.  *Deborah K. v. Kijakazi*, No. 320CV02065GPCAHG, 2022 WL

17   486528, at *8 (S.D. Cal. Feb. 16, 2022).  There is a split amongst district courts in the

18   Ninth Circuit as to whether the Circuit's prior case law regarding deference to treating

19   physicians still applies.  *Compare id.*; *Kathy Jean T. v. Saul*, No. 20cv1090-RBB, 2021

20   WL 2156179, at *5 (S.D. Cal. May 27, 2021) ("This measure of deference to a treating

21   physician is no longer applicable under the 2017 revised regulations."), *with Robert D. v.*

22   *Kijakazi*, No. 20cv2132-AJB-MSB, 2021 WL 5905734, at *3 (S.D. Cal. Dec. 14, 2021);

23   *Kathleen G. v. Comm'r of Soc. Sec.*, No. C20-461-RSM, 2020 WL 6581012, at *3 (W.D.

24   Wash. Nov. 10, 2020) (finding that the "specific and legitimate" standard for rejecting

25   contradicted opinions of a treating doctor continues to serve as a "benchmark against

26   which the Court evaluates [the ALJ's] reasoning").

27         This Court "agrees with the numerous district courts that found the treating source

28   rule is inconsistent with the SSA's 2017 regulations, which effectively displace or

25

override it." *Julie R. M. v. Kijakazi*, No. 20cv1608-LL-MDD, 2021 WL 4993034, at *4 (S.D. Cal. Oct. 26, 2021); *see Allen T. v. Saul*, No. 19-1066, 2020 WL 3510871, at *3 (C.D. Cal. June 29, 2020) ("Nevertheless, the Court is mindful that it must defer to the new regulations, even where they conflict with prior judicial precedent, unless the prior judicial construction 'follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.' The Court defers to the new rules here.") (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005)); *see, e.g.*, *Jones*, 2021 WL 620475, at *6–*10; *Joseph Perry B. v. Saul*, No. SACV 20-1196-KS, 2021 U.S. Dist. LEXIS 59742, at *7 (C.D. Cal. Mar. 29, 2021).[2]  Accordingly, the Court will address the ALJ's evaluation of the medical opinions at issue here under the 2017 regulations.

### 2.      Dr. Pack's Opinion

In discussing Dr. Pack's opinion, the ALJ stated as follows:

> In February 2018, Rachel Tabangcura, Pack, D.O., opined that the claimant's symptoms, including neck pain, back pain, shoulder pain, knee pain, and toe pain did not improve with surgeries, medication, and workplace modifications (Ex. 11F). Dr. [Pack's] opinion is unpersuasive because it is too general to be of assistance in assessing the claimant's residual functional capacity. It is also not dispositive on whether Dr. Pack believes that the claimant is disabled. In addition, the determination of whether an individual's RFC prevents her from doing past relevant work are administrative findings that are reserved for the Commissioner (20 CFR404.1527(e)).

AR 28-29.

Under the new regulations, the ALJ may discuss each of the factors to be

---

[2] The Court is particularly persuaded by the court's analysis in *Jones*, which actually considered and analyzed whether the new regulations are valid and should be afforded deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  2021 WL 620475, at *6–*10.  *Jones* concluded that the new regulations were valid, should be entitled to deference, and overrode the prior Ninth Circuit caselaw establishing the Treating Physician Rule.  *Id.*

considered in his opinion, is only required to explain how he considered the most important factors—supportability and consistency—when determining a medical source's persuasiveness.  20 C.F.R. § 404.1520c(b)(2)-(3).  Unfortunately, the ALJ fails to do so here.  In his one paragraph opinion, he only broadly surmises that Dr. Pack's opinion is too general to be of use, but he does not discuss the substance of her opinion at all, despite her having treated Plaintiff for over two years.  He fails to address the supportability of the opinion, or consistency with the other medical opinions in the record, as required by the regulations.

Thus, the Court finds that the ALJ did err in not sufficiently addressing the factors required under the new regulations.

## IV.   DISPOSITION

For the reasons discussed above, the Court concludes that the ALJ erred in (1) not providing clear and convincing reasons for rejecting Plaintiff's testimony about her subjective symptoms; and (2) failing to sufficiently address the factors required under the new regulations for rejecting Dr. Pack's opinion.  Where the ALJ denies benefits and the court finds error, ordinarily, the case must be remanded to the agency for further proceedings before directing an award of benefits. *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Triechler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090 1099 (9th Cir. 2014)).  The Court finds that remand for further proceedings consistent with this Order is the appropriate relief for Plaintiff.

//
//
//
//
//
//
//
//

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion for summary judgment, **GRANTS IN PART AND DENIES IN PART** Defendant's motion for summary judgment, and **REMANDS** the case to the Commissioner for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated:  March 15, 2022

Hon. Nita L. Stormes
United States Magistrate Judge